UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DONALD H. BUCKNER, JR.,

                              Plaintiff,

                    - against -

COUNTY OF SULLIVAN, and MICHAEL SCHIFF,
SHERIFF, COUNTY OF SULLIVAN, Individually,

                             Defendants.
------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 12-CV-3770 (CS)

Appearances:
Michael Sussman
Sussman & Watkins
Goshen, New York
*Counsel for Plaintiff*

Cheryl A. McCausland
Senior Assistant County Attorney
County of Sullivan
Monticello, New York
*Counsel for Defendant County of Sullivan*

Stephen G. DeNigris
Schenectady, New York
*Counsel for Defendant Michael Schiff*

Seibel, J.

       Before the Court is the joint motion for summary judgment of Defendants Sullivan County (the "County") and Michael Schiff. (Doc. 58.) For the reasons stated below, the Motion is GRANTED.

## I. Background

       The following facts, which are based on the parties' Local Rule 56.1 statements and supporting materials, are undisputed unless noted.

Plaintiff Donald Buckner, an African-American, began working at the County Sheriff's Department in September 1989 as a patrol deputy. (Doc. 71 ¶ 1.) He was promoted to detective in March 2004. (*Id.* ¶ 2.) The County Sheriff is (and was at all relevant times) Defendant Schiff.

On June 26, 2007, Plaintiff and thirty-three other officers were subjected to a surprise drug test by the County Sheriff's Department, which has a policy prohibiting drug use by officers. (Doc. 70 ¶ 9; Chaboty Decl.[1] ¶ 5; DeNigris Decl.[2] Exs. A, B, U.) Plaintiff and another African-American officer, Lillian Allen, tested positive on the drug test, for cocaine and marijuana, respectively.[3] (Doc. 70 ¶¶ 12, 45; Chaboty Decl. ¶ 6 & Ex. A at 1, 4.) (The parties dispute whether any of the other officers who were tested on that date tested positive, and the Court will address their evidence on this issue in detail below.)

---

[1] "Chaboty Decl." refers to the Declaration of Eric Chaboty in Support of Defendants' Motion for Summary Judgment (Doc. 63).

[2] "DeNigris Decl." refers to the Declaration of Stephen G. DeNigris, Esq. (Doc. 61).

[3] Although Plaintiff admits that he *tested* positive for cocaine, (*see* Doc. 70 ¶¶ 12, 34-35), he argues that the test results were inaccurate, (*see* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("P's Mem.") (Doc. 66) 11-12, 14-16). As support, Plaintiff cites the affidavit of his former co-worker Robert Brewster, in which Brewster states that (1) he was not required to provide identification to the employee of Partners in Safety (an outside testing service retained by Defendants) who conducted his drug test; (2) "[t]he urine samples were contaminated because they were not refrigerated and sat in the sun all day"; (3) he overheard a Partners in Safety employee say that "the urine samples were left in an airport hangar for three days before they were shipped out to the laboratory"; and (4) "[t]here was no proper chain of custody." (Sussman Affirmation in Opposition to Defendants' Motion for Summary Judgment ("Sussman Aff.") (Doc. 69) Ex. 5 ¶¶ 55, 61-63.) This evidence cannot create a factual dispute as to the test results' accuracy. Officer Brewster states that he provided his urine sample in the presence of Officer Hawker, who knew Brewster, obviating the need for Brewster to prove his identity. (*See id.* ¶¶ 41-52.) The Partners in Safety employee's alleged statement cannot be considered because it is inadmissible hearsay. *See* Fed. R. Civ. P. 56(c). And Officer Brewster does not give any basis on which to assume he had personal knowledge of what happened to the urine samples – indeed, he states that he left the bathroom right after giving his sample. (*See* Sussman Aff. Ex. 5 ¶ 54). Nor does Plaintiff provide any evidence that exposure to sun could contaminate a sample or that any tampering of samples occurred. Plaintiff also did not raise any of these concerns during his disciplinary hearing. (*See* DeNigris Decl. Exs. T, U.) In any case, the issue of whether Plaintiff's positive result is accurate is not relevant to Plaintiff's discrimination claims because Plaintiff does not allege that Defendants knew that the test results were false but terminated him anyway. Plaintiff does not dispute that the documents attached as Exhibit A to the Chaboty Decl., which reflect that he tested positive for cocaine, are the results provided to Defendants by Partners in Safety. (*See* Chaboty Decl. Ex. A; Declaration of Michael A. Schiff (Doc. 62) ¶ 7.)

The following month, Plaintiff's union, the Patrolman's Benevolent Association ("PBA"), filed a grievance against the County and Sheriff Schiff, asserting that the drug test had been performed pursuant to a policy and procedure that had not been negotiated with the PBA. (Doc. 70 ¶ 13.) The dispute centered over whether all officers in a randomly chosen shift could be tested, as occurred here, or whether individual officers had to be randomly selected from among all employees, as apparently had been done in the past. (*Id.* ¶¶ 13, 18-19.) That grievance was arbitrated in May 2008, and in August 2008 the arbitrator issued an award sustaining the PBA's grievance and ordering the County to revert to the prior drug testing policy and to rescind any disciplinary actions taken against employees as a result of the "unilaterally changed" drug testing procedure. (*Id.* ¶¶ 17, 22-23; DeNigris Decl. Ex. J.)

Shortly after the PBA filed its grievance, Sheriff Schiff filed a Notice of Discipline against Plaintiff, pursuant to Section 75 of the New York Civil Service Law, charging him with misconduct arising from the positive result on the June 26, 2007 drug test, and placed him on administrative leave. (Doc. 70 ¶ 14.) Plaintiff's Section 75 disciplinary hearing was adjourned for several years while the parties awaited the outcome of the PBA's grievance arbitration and while Plaintiff pursued an ultimately unsuccessful Article 78 action[4] against Sheriff Schiff and the County related to the appointment of the impartial hearing officer for Plaintiff's hearing. (*Id.* ¶¶ 21, 25.) Plaintiff's disciplinary hearing finally took place on August 19, 2010. (*Id.* ¶ 32.) On December 10, 2010, after the impartial hearing officer issued a report concluding that Plaintiff had violated the County's drug policy and recommending his termination, Sheriff Schiff terminated Plaintiff's employment. (*Id.* ¶¶ 36-37.) Separately, Defendants also terminated

---

[4] Article 78 of the New York Civil Practice Laws and Rules provides the method by which a party may appeal a decision by a New York state or local agency. *See* N.Y. C.P.L.R. §§ 4801-06.

3

Officer Allen.  *See Allen v. Schiff*, 908 F. Supp. 2d 451, 457 (S.D.N.Y. 2012), *aff'd*, 586 F. App'x 759 (2d Cir. 2014).

In the instant lawsuit, Plaintiff asserts that Defendants used the drug test results in a racially discriminatory manner because they terminated him and Officer Allen based on the results but did not terminate Caucasian employees who allegedly failed the same drug test, (*see* First Amended Complaint ("FAC") (Doc. 16) ¶¶ 16-20), or who Defendants knew had used illegal drugs in violation of County Sheriff's Office policy, (*see* P's Mem. 4-6, 15-17).  Plaintiff also cites as evidence of discriminatory intent two instances in which Arthur Hawker, the County Sheriff's Office Chief of Patrol, made allegedly racially insensitive comments to him prior to his termination.  (FAC ¶ 21.)

Plaintiff brings a claim against Schiff pursuant to 42 U.S.C. § 1983 for violation of his Fourteenth Amendment right to equal protection and a *Monell* claim against the County based on Schiff's status as the County's final decision-maker with respect to Plaintiff's termination.  (*Id.* ¶¶ 3, 26.)  Defendants have moved for summary judgment, arguing that they are entitled to judgment as a matter of law because there is no genuine dispute that Plaintiff was terminated because he failed the drug test and not because of his race.

## II.  Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting

materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

## III. Discussion

### A. Equal Protection Claim

Plaintiff brings a Section 1983 claim against Defendants based on the alleged deprivation of his constitutional rights under the Fourteenth Amendment's Equal Protection Clause. To prevail on this claim, Plaintiff must show that Sheriff Schiff, acting under color of state law, violated his constitutional rights. 42 U.S.C. § 1983; *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). As Defendants do not argue that Sheriff Schiff was not acting under color of state law, the only question is whether he violated Plaintiff's constitutional rights.

Because Plaintiff alleges disparate treatment in employment, his Equal Protection claim is treated like a Title VII claim for employment discrimination, and analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006). Under that framework, Plaintiff must establish a *prima facie* case of discrimination by showing: (1) he is a member of a protected class; (2) he satisfactorily performed his job duties; and (3) he suffered an adverse employment action; (4) in circumstances giving rise to an inference of discrimination. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995). If Plaintiff establishes a *prima facie* case, a rebuttable presumption of discrimination arises and the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the adverse action. *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001). If Defendants articulate such a reason, the presumption of discrimination is dropped and the burden shifts back to Plaintiff to show that

6

Defendants' reason is actually a pretext for unlawful discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

Plaintiff cannot establish a *prima facie* case because he has not presented evidence by which a rational jury could infer that Defendants terminated Plaintiff based on his race.  Plaintiff attempts to show discriminatory intent in two ways:  (1) by referring to comments and acts by his supervisor that he argues demonstrate Defendants' race-based animus and (2) by comparing himself to several Caucasian officers of the County Sheriff's Department who Plaintiff alleges were similarly situated to him yet disciplined less harshly.  Plaintiff's evidence as to each of these categories, however, is insufficient to create a factual dispute as to Defendants' discriminatory intent.

     1.  <u>Comments Regarding Plaintiff's Race</u>

Plaintiff attempts to show Defendants' discriminatory intent by reference to two remarks made by his supervisor, Chief of Patrol Arthur Hawker, prior to his suspension.  First, in late December 2006, after Plaintiff responded to a hostage situation with an African-American perpetrator and spent three hours resolving the situation, Officer Hawker allegedly commented that Plaintiff was successful only because he "spoke jive better," (Sussman Aff. Ex. 1 at 8:20-9:19), which Plaintiff alleges is a "plain and stereotypic reference to [his] race," (FAC ¶ 21(a)).  On another occasion, when an assignment compelled Plaintiff and his partner to travel to a predominately white, rural area of Pennsylvania, Officer Hawker allegedly told Plaintiff, in reference to Plaintiff's race, that he "must have went over real big out there."  (*Id.* ¶ 21(b).)

These comments do not suffice to create a fact issue as to Defendants' discriminatory intent.  While they are reasonably interpreted as referring to Plaintiff's race, statements that merely acknowledge an individual's membership in a protected class do not support an inference

7

of discriminatory animus. *See Pasha v. William M. Mercer, Inc.*, No. 00-CV-8262, 2004 WL 188077, at *4 (S.D.N.Y. Feb. 2, 2004). The statement regarding "jive" – the more offensive of the two – while juvenile and inappropriate, was made eight months before Sheriff Schiff issued Plaintiff's Notice of Discipline (and several years before Plaintiff was terminated). *See Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks . . . unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992)). That Officer Hawker also prepared a commendation for Plaintiff based on his successful handling of the hostage situation, (Declaration of Arthur J. Hawker in Support of Summary Judgment (Doc. 64) ¶ 14), suggests that this comment was an awkward attempt at a compliment. *See Augustus v. AHRC Nassau*, 976 F. Supp. 2d 375, 398 (E.D.N.Y. 2013) (praise of plaintiff is "inconsistent with racial animus"). The comment regarding Plaintiff's trip to rural Pennsylvania is plainly a reference to potential racial prejudice on the part of residents of that area that does not reflect such prejudice on the part of Officer Hawker. (*See id.* ¶¶ 16-17).[5]

Plaintiff also fails to allege that Hawker was a decision-maker in the County Sheriff's Office whose comments could demonstrate discriminatory motivation on the part of Defendants. *See De Santis v. City of New York*, No. 10-CV-3508, 2011 WL 4005331, at *10 (S.D.N.Y. Aug. 29, 2011) ("These stray remarks are not attributed to . . . named defendants, but to [individuals] who played no role in [the decision], and are therefore plainly insufficient to demonstrate discriminatory animus."); *Georgy v. O'Neill*, No. 00-CV-660, 2002 WL 449723, at *6 (E.D.N.Y.

---

[5] In an oral ruling on Defendants' motion to dismiss the FAC, the Court ruled that these same comments did not plausibly demonstrate discriminatory intent on the part of Defendants. (*See* Minute Entry 8/6/13.)

March 25, 2002) (reference to national origin by non-decisionmaker, six months before plaintiff's termination, is "the kind of isolated and stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment"); *Khachikian v. BASF Corp.*, No. 91-CV-573, 1993 WL 463734, at *11 (N.D.N.Y. Nov. 5, 1993) (comments of non-decisionmakers about plaintiff's age and national origin did not support inference of discrimination where no evidence suggests decisionmaker relied on such comments in making discharge decision).[6]

   2. <u>Other Officers as Comparators</u>

Plaintiff may also raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (*citing Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, (1977)). Within the Second Circuit, courts are split over the standard by which a plaintiff must show that he or she is "similarly situated" to a comparator in order to make out a claim of selective enforcement based on membership in a protected class. "[S]ome district courts . . . have stated that the similarly situated test is the same in selective enforcement and 'class of one' cases and, thus, have required plaintiffs . . . to show an extremely high degree of similarity between themselves and the claimed comparators" – that is, that they are "*prima facie* identical." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693-97 (S.D.N.Y. 2011) (collecting

---

[6] Nor is Plaintiff's allegation (not mentioned in the FAC) that Undersheriff Chaboty "would slap plaintiff 'high five' and call him 'bro' in the workplace," (P's Mem. 13), sufficient to create a fact issue as to discriminatory intent. These acts do not carry a racial connotation in this day and age, (*see* High five, Wikipedia (Jan. 28, 2015), http://perma.cc/6TUZ-YWXA; High five, Urbandictionary (Jan. 28, 2015), http://perma.cc/BP9S-7JHS; Bro (subculture), Wikipedia (Jan. 28, 2015), http://perma.cc/75SH-6YAY; Bro, Urbandictionary (Jan. 28, 2015), http://perma.cc/VV3M-7RQ4), and, without the allegation that they were performed sarcastically or in some other hostile manner, reflect amity more than animus. Indeed, Plaintiff acknowledges that Chaboty's conduct was an effort to gain Plaintiff's political support by "trying to befriend me . . . and break the ice and find a common bond." (Sussman Aff. Ex. 1 at 11:25-12:22.)

cases). Other district courts have applied a less demanding test for selective enforcement claims, however, and required plaintiffs to prove only that they are "similarly situated in all material respects" or "roughly equivalent" to their comparators. *Id.* This Court agrees with the latter group and will apply the less exacting standard to this race-based selective enforcement claim. Proving disparate treatment based on membership in a protected class does not require the same "extremely high level of similarity [that] is required in the 'class of one' context because plaintiffs asserting those claims are attempting to prove that the government's treatment was arbitrary and irrational." *Id.*

While Plaintiff alleged in the FAC that Defendants "failed to terminate similarly-situated white deputy sheriffs who tested dirty on the same test," (FAC ¶ 26; *see id.* ¶¶ 18-20), he has provided no comparator matching this description.[7] Defendants' evidence that no Caucasian officer tested positive on June 26, 2007 – documentation of the test results for all 34 officers and a declaration from Undersheriff Eric Chaboty, who oversaw the drug test on behalf of the County, confirming those results – is uncontroverted. (*See* Chaboty Decl. ¶¶ 3, 6 & Ex. A.) Plaintiff now presents as comparators several Caucasian officers of the County Sheriff's Department, each of whom he alleges was known to have used illegal drugs yet was disciplined either less harshly than he was or not at all. There is no genuine dispute, however, that none of these officers was both similarly situated to Plaintiff and disparately treated by Defendants such that an inference of Defendants' discriminatory intent can arise from the comparison.

One of these potential comparators is Officer John Wagner, who Plaintiff alleges "was provided an opportunity to dilute his urine sample rather than being disciplined." (P's Mem. 16; *see id.* at 4-5, 15.) According to Chief of Patrol Hawker, on the day of the test Officer Wagner

---

[7] Nor does Plaintiff make reference to any other drug test administered by the County.

10

was unable to give a urine sample at 8:50 a.m. and left the patrol headquarters (where the testing took place) to go back to the jail (which was presumably Wagner's workplace as he was assigned to the corrections unit). (Sussman Aff. Ex. 6 at 5:16-19, 12:15-13:13, 45:21-25, 46:14-22.) Wagner eventually gave a sample at 11:02; the test results show (and Plaintiff does not dispute) that he tested negative. (*See* Chaboty Decl. ¶¶ 7-14 & Ex. A at 33.)[8]

Plaintiff and Officer Wagner are not similarly situated. Had Officer Wagner failed the June 26, 2007 drug test, he and Plaintiff would be sufficiently equivalent that their disparate treatment could raise an inference of racial discrimination. That is not what happened, however. Instead, Plaintiff has cooked up a theory – that Defendants provided Wagner, but not Plaintiff, with the opportunity to dilute his urine and thereby thwart the test and avoid discipline – that requires far more proof than Plaintiff offers. Plaintiff is only able to show that Officer Wagner

---

[8] Plaintiff argues that Wagner was treated more favorably because he was allowed a lengthy time lapse before providing a sample, allowing him the opportunity to dilute the presence of drugs in his system. (P's Mem. 4-5, 15-16.) In other words, he argues that Defendants allowed Wagner to test negative. He contradictorily also argues that Wagner tested positive. (*Id.*) The evidence that Plaintiff cites to support the latter claim – from Officer Robert Brewster's declaration, Officer Charles Mack's affidavit and Plaintiff's deposition – is hearsay. *See* Fed. R. Civ. P. 56(c). Officer Brewster states that after the results from the June 26, 2007 drug test came back, Undersheriff Eric Chaboty told him "[w]e got the jail preacher dirty," which Brewster knew was a reference to Officer Wagner. (Sussman Aff. Ex. 5 ¶¶ 72-74.) Officer Mack states that he heard Chaboty make this comment too. (Sussman Aff. Ex. 10 ¶ 31.) Additionally, Officer Brewster states that he "knew from conversations that [Wagner] had provided urine and was dirty." (Sussman Aff. Ex. 5 ¶ 74.) Both the alleged statement by Chaboty and the other "conversations" are hearsay. Plaintiff's testimony at his deposition that Officer Wagner was "given the opportunity to attempt to give his specimen and then leave for two hours and then come back [and] was known to be a marijuana user," (Sussman Aff. Ex. 1 at 38:7-14), is also hearsay because Plaintiff admitted that his knowledge was based solely on what other officers told him or "what [he] read," (*id.* at 40:5-9, 41:6-42:6, 42:17-22, 43:5-8, 82:17-25). Plaintiff has offered no possible hearsay exception, and the Court is reluctant to supply one for a counseled party. Chaboty's alleged statement, however, could be an admission under Federal Rule of Evidence 801(d)(2)(D). Nevertheless, it is not sufficient to raise a genuine issue of material fact as to whether Wagner tested positive. It is clear from Brewster's affidavit that Chaboty's comment was not serious. According to Brewster, Chaboty looked at his computer and said to Brewster "with a smile: 'You came back positive.'" (Sussman Aff. Ex. 5 ¶ 73.) Nobody alleges that Brewster in fact tested positive. According to Brewster, Chaboty "thought it was funny and continued by stating: 'We got the jail preacher dirty.'" (*Id.* ¶ 74.) Given that the test results inarguably show that neither Brewster nor Wagner tested positive, and given that by Brewster's account the whole conversation was in jest, no reasonable jury could conclude from Chaboty's statement that Wagner in fact tested positive (assuming that statement to be admissible). The comment is a "scintilla" of evidence, *see Anderson*, 477 U.S. at 252, but not enough to reasonably support the proposition that Wagner tested positive and Defendants knew it – a proposition that Plaintiff does not even clearly advance and that contradicts the proposition he does advance.

did not produce a urine sample on his first attempt, left the testing site, and later that day gave a sample that tested negative.  The inferences that Officer Wagner used illegal drugs, that he took advantage of the time interval to cheat on the drug test, and that he did so with the knowledge (or even the tacit permission) of Defendants cannot be reasonably drawn from these facts.

Plaintiff next argues that he is similarly situated to Officer Eric Stout, who Plaintiff alleges "made an oral admission that he had been using narcotics" on the day of the drug test, but was neither tested nor disciplined.  (P's Mem. 16; *see id.* at 5-6.)  Plaintiff provides four sources in support of this allegation:  (1) Plaintiff's deposition testimony that he heard about Stout's admission from other officers, (Sussman Aff. Ex. 1 at 38:7-11, 42:17-23, 43:5-8); (2) Officer Hawker's deposition testimony that another officer told him that someone else had said that "Eric Stout had been, the day of the test in 2007, expressing concern about whether he might come back positive for marijuana use," (*id.* Ex. 6 at 43:3-24); (3) the declaration of Officer Brewster that "another white correctional officer – ES – admitted that he had smoked marijuana and provided urine on June 26, 2007," (*id.* Ex. 5 ¶ 75); and (4) the declaration of Officer Mack, in which Mack states that he "was told by [ES,] another white correctional officer[,] that [ES had] smoked marijuana the night before giving urine . . . and he was not disciplined or terminated," (*id.* Ex. 10 ¶ 32).  The first two sources – Plaintiff's and Officer Hawker's testimony about what they heard about Officer Stout from others – are inadmissible hearsay that cannot create a factual dispute for purposes of avoiding summary judgment.  *See* Fed. R. Civ. P. 56(c).  The third source – Officer Brewster's declaration – should not be considered because there is no indication or reason to believe that Brewster personally heard ES admit anything.  *See*

*id.* The Court can consider the fourth source, Officer Mack's statement, but only for the fact that ES made the admission and not for the truth of what he said (*i.e.*, that he had used marijuana).[9]

Officer Stout's admission of marijuana use (assuming he is "ES") does not make him a proper comparator for Plaintiff. It is not an officer's drug use, but Defendants' knowledge of that drug use, that is relevant to Plaintiff's discrimination claim, and Plaintiff has presented no evidence that Defendants ever learned about Officer Stout's admission. Furthermore, other evidence establishes that Officer Stout was in fact drug tested on June 26, 2007, and his results came back negative.[10] (*See* Chaboty Decl. ¶¶ 7-14 & Ex. A at 30 (negative test results for Caucasian male correctional officer "Eric Staudt").) Even assuming that Defendants did know about Officer Stout's marijuana admission, his negative test results materially differentiate him from Plaintiff because it would have been very difficult for Defendants to discipline Stout for drug use after he tested negative.[11]

Plaintiff also presents Officer Keith Molinari as a comparator. Plaintiff alleges that Officer Molinari used cocaine in the office but instead of being disciplined was "offered an opportunity to resign and . . . to get another County position at the college through Undersheriff

---

[9] Plaintiff's testimony has two layers of hearsay: Stout's alleged admission and the statements of other officers who reported it to Plaintiff. Hawker's testimony contains three layers of hearsay: Stout's alleged admission, the statement of the other officer, and the statement of the person who spoke to the other officer. Mack's testimony has one layer of hearsay (as would Brewster's, if his testimony were on personal knowledge): Stout's alleged admission. Plaintiff has suggested no hearsay exception for any of these layers. Stout's admission would not qualify as a statement against interest under Federal Rule of Evidence 804(b)(3) because there is no showing that Stout is unavailable as a witness. The Court cannot think of any hearsay exception that would cover it or the other layers.

[10] Plaintiff contends that Officer Stout was not drug tested on June 26, 2007, (P's Mem. 16), but his only evidence of that is his own deposition testimony that he later abandoned, (*compare* Sussman Aff. Ex. 1 at 38:7-11 *with id.* at 82:7-16).

[11] Even if one could assume that Hawker conveyed to Schiff what Hawker was told by another officer that a third person had said about what Stout allegedly said – an assumption that is by no means warranted given how unreliable this fourth-hand information would have been – the evidence is that Hawker heard about Stout's statement a year after the test. (Sussman Aff. Ex. 6 at 43:6-17.)

Chaboty." (P's Mem. 16-17.)[12] But Plaintiff's only evidence supporting this allegation is hearsay – his own testimony about what "everybody knew" but what he had never personally observed. (*See* Sussman Aff. Ex. 1 at 38:16-39:24.) In other words, Plaintiff relies solely on what he heard from other officers. Plaintiff thus has no evidence supporting Molinari as a comparator, let alone evidence disputing Defendants' evidence that Officer Molinari was never caught using cocaine and retired honorably from the County Sheriff's Office on disability in 2006. (*See* Chaboty Reply Decl. ¶ 7.)[13]

Additionally, Defendants have presented evidence that Plaintiff was offered the opportunity to resign in good standing rather than be terminated, but declined. (*See* Reply Declaration of Stephen G. DeNigris, Esq. (Doc. 72) ¶¶ 10-21 & Ex. 1 at 5.)[14] Thus, even if Plaintiff had evidence that he and Officer Molinari were similarly situated, he has none that they were disparately treated.

Plaintiff next argues that Officer Steven Smith is similarly situated to him. According to Plaintiff, a few weeks after the June 26, 2007 drug test, Undersheriff Chaboty found Officer Smith using drugs at a drug house in Bethel, New York, and brought him back to the station. (P's Mem. 6, 16-17.) At the time, Officer Smith had one-eighth of an ounce of cocaine in his pocket. (*Id.*) Instead of being fired or prosecuted, Defendants permitted Officer Smith to resign

---

[12] Plaintiff argues in his brief that Officer Molinari was "caught" using cocaine in the office, (P's Mem. 16), but the testimony cited for that proposition was Plaintiff's testimony that Molinari "was using" at the office, (Sussman Aff. Ex. 1 at 38:16-39:2).

[13] "Chaboty Reply Decl." refers to the Reply Declaration of Eric Chaboty (Doc. 74).

[14] No reasonable juror could believe that Plaintiff was not given the opportunity to resign in good standing, given that Plaintiff's only evidence in this regard is his own statement that Officer Smith "was permitted to resign, an option I was certainly not given," (*see* Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment (Doc. 67) ¶ 3), and Defendants have presented documentation showing that such an offer was extended to Plaintiff's attorneys on several occasions. Of course, Plaintiff also could have resigned without an agreement as to standing at any time.

14

at a later date. (*Id.*)[15] Defendants do not dispute that they learned that Officer Smith had used illegal drugs, but provide evidence that Smith was disciplined for this misconduct: a Section 75 Notice of Discipline, dated July 25, 2007 and signed by Sheriff Schiff, charging Smith with, among other things, cocaine use. (Chaboty Reply Decl. ¶ 5 & Ex. B.) Additionally, a declaration by Undersheriff Chaboty provides that "Deputy Smith . . . resigned on June 11, 2008, pending a hearing on these disciplinary charges." (*Id.*) Therefore, while Plaintiff has demonstrated that he and Officer Smith were similarly situated because both were County Sheriff's Office employees known by Defendants to have used illegal drugs, he has failed to raise a fact question as to his selective treatment. Plaintiff was not selectively treated because he and Officer Smith were disciplined in the same manner. That Officer Smith chose to resign rather that proceed to his Section 75 hearing (a fact that is undisputed) does not demonstrate any leniency towards him on the part of Defendants. Furthermore, as stated above, Plaintiff was offered the opportunity to resign in good standing in 2009 but did not take it.

Finally, Plaintiff briefly mentions as a possible comparator "[a]nother white officer, Zayas, [who] has had at least six alcohol-related incidents including DWI/DWAI convictions . . . and remains in patrol in a supervisory capacity." (P's Mem. 6.) But Plaintiff provides no factual support for this allegation whatsoever. Additionally, Defendants have provided a declaration from Undersheriff Chaboty, who after reviewing New York Department of Motor Vehicles records covering the last ten years, states that during that time, "there is no indication . . . of any alcohol driving related arrest or conviction for this deputy." (*See* Chaboty Reply Decl. ¶¶ 8-10.) Plaintiff has thus failed to establish that compared with others similarly situated, he was

---

[15] As evidence, Plaintiff provides Sheriff Schiff's testimony that Undersheriff Chaboty did indeed retrieve Officer Smith from a drug house and that Schiff and others discussed Smith's drug use at a subsequent meeting. (*See* Sussman Aff. Ex. 3 at 6:23-7:4, 10:8-11.)

selectively treated such that a reasonable fact-finder could find an inference of discrimination by Defendants.[16]

Having failed to provide evidence creating a triable issue as to inference of discrimination, Plaintiff cannot make out a *prima facie* case of discrimination. Even if Plaintiff had done so, Defendants have provided a legitimate non-discriminatory reason for terminating Plaintiff: "to remove from employment a police officer who was using cocaine." (Doc. 60 at 17.) Plaintiff also cannot carry his burden to demonstrate that this reason is a pretext for discrimination. While Plaintiff's burden at the first *McDonnell Douglas* stage is minimal, *see Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 380-81 (2d Cir. 2001), to survive summary judgment, at the third stage, Plaintiff must present not just some evidence, but sufficient evidence that the stated reason was false and a cover-up for discrimination, *see Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996). Plaintiff has failed to do so for the same reasons that his evidence does not create a triable issue as to inference of discrimination.

---

[16] Additionally, Plaintiff argues that he was denied equal protection because Defendants "terminated him on the basis of evidence which they had been forbidden by law to reply [sic] upon" based on the arbitration award in favor of the PBA. (FAC ¶ 26; *see* P's Mem. 1, 7.) But whether the drug test violated the union's collective bargaining agreement with the County simply has no bearing on Plaintiff's allegations of constitutional harm, which turn on whether Defendants used the drug test in a racially discriminatory manner. To the extent Plaintiff is arguing that reliance on the test results is so lawless that a Sheriff would only rely on them if animated by discriminatory intent, this argument is meritless. First, there was no effort to get a court to confirm the arbitration decision, so Schiff's choice to ignore it may have been a contractual violation or a thumbing of his nose at the PBA, but it was not a violation of law. Second, as I said at the time of the motion to dismiss, a rational sheriff might well decide that he would rather risk the wrath of the union than keep a drug user on staff in a law enforcement capacity. Indeed, most members of the public would probably expect him to do so. Such a decision (even if one disagrees with it) is hardly so illegitimate that it raises an inference that it was motivated by racial animus, rather than a concern for public safety or police force discipline. Nor is Plaintiff correct that the Court may not rely on the test results in this litigation because they are "illegal." (P's Mem. 11-12.) The arbitration award states only that "[i]f any disciplinary actions have been taken against employees as a result of the [drug testing] policy, any record of such actions shall be removed from the employee's record and said employee(s) will be made whole . . . ." (DeNigris Decl. Ex. J at 3.) This case is not a disciplinary action against Plaintiff.

In conclusion, Defendants have succeeded in showing that there is no genuine dispute as to any fact material to Plaintiff's Equal Protection claims. Viewing the evidence collectively and in the light most favorable to Plaintiff, he has failed to raise an inference of discrimination and has not made out a *prima facie* case. Defendants are thus entitled to judgment as a matter of law.

### B. Municipal Liability

Plaintiff claims that the County is liable for Sheriff Schiff's actions under the *Monell* doctrine. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But absent an underlying constitutional violation, a *Monell* claim cannot lie. *See Bolden v. Cnty. of Sullivan,* No. 11-CV-4337, 2013 WL 1859231, at *2 (2d Cir. May 6, 2013) (summary order) ("[B]ecause the district court properly found no underlying constitutional violation, its decision not to address the County defendants' liability under *Monell* was correct."); *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) (*"Monell* does not provide a separate cause of action . . . it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.") (emphasis in original). As Plaintiff cannot show that there was any constitutional violation, he also cannot make out a *Monell* claim.[17]

## IV. Conclusion

For the reasons stated above, Defendants' Joint Motion for Summary Judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the pending motion, (Doc. 58), enter judgment for Defendants, and close the case.

---

[17] Defendants argue that Plaintiff's counsel has submitted false affidavits in bad faith and request relief under Federal Rule of Civil Procedure 56(h). (*See* Doc. 75 at 3-4.) The Court is not convinced that counsel's errors were made in bad faith and so denies Defendants' request for sanctions, but advises Plaintiff's counsel to take more care in the future. Gross inaccuracies, whether or not intended, undermine credibility with the Court. And at some point such carelessness can amount to bad faith.

**SO ORDERED.**

Dated: February 3, 2015
      White Plains, New York

                                                CATHY SEIBEL, U.S.D.J.